UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

_____

JOHN G. WAHLBERG, a Michigan citizen,
and WAHLBERG CONSTRUCTION, INC.,
a Michigan corporation,

      Plaintiffs,

v.                                                      Case No.  2:12-cv-116

BENSON BUILDERS, LLC, a Wisconsin         HON. GORDON J. QUIST
limited liability company,

      Defendant.
_____/

**OPINION**

      Plaintiffs and Defendant have each filed motions.  Plaintiffs, John Wahlberg and Wahlberg Construction, Inc. (collectively "Wahlberg"), have filed a Motion for Summary Judgment. (Docket no. 10.)  Defendant, Benson Builders, LLC, has filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction, Improper Venue, or to Transfer Venue. (Docket no. 13.) Benson Builders also presented its argument to dismiss for lack of subject matter jurisdiction in its response to Wahlberg's motion for summary judgment.  Because Wahlberg has not come forth with particular facts that a case or controversy is ripe for consideration, Wahlberg's complaint requesting a declaratory judgment will be dismissed without prejudice.

**I. BACKGROUND**

      Wahlberg Construction, owned and operated by John Wahlberg, provides custom carpentry and homebuilding services to residential homeowners in Northern Wisconsin and the Upper Peninsula of Michigan.  On occasion, Wahlberg worked as a subcontractor for Benson Builders.

      In June of 2010, Robert Pachmayer, owner of Benson Builders, contacted John Wahlberg

and asked him to sign a Non-Solicitation Agreement (the "NSA") (Wahlberg Decl. I ¶¶ 25, 26.), which Wahlberg signed on June 9, 2010. (*Id.* ¶ 32; NSA (docket no. 12-1).) The duration of the NSA runs from June 9, 2010, through June 8, 2013, with no means of early termination, and does not guarantee that Benson Builders will provide Wahlberg Construction with a certain amount of work. (NSA § 1.) The NSA is "governed by and construed in accordance with the laws of the State of Wisconsin." (NSA § 3(g).)

> The NSA contains a "Non-solicitation of Customers" clause, which states:
>
> Except in the course and scope of [Wahlberg Construction's] duties for [Benson Builders], [Wahlberg Construction] agrees that [it] shall not, at any time that this agreement is in effect or at any time during the five (5) year period following the end of this Agreement, for any reason, either directly or indirectly: (i) solicit or entice, (ii) attempt to solicit or entice, or (iii) provide products or services competitive with those products or services offered or sold by the Company during the twenty four (24) months preceding the date of the agreement with [Benson Builders] to any Customers so as to cause, or attempt to cause, any Customer not to do business with [Benson Builders] or to purchase products or services sold by [Benson Builders] from any other source other than the Company.

(*Id.* § 2(c).) A customer is defined as the following:

> The term "Customer" means any individual or entity for whom the Company has provided services or Products, or to whom it is in the process of or has made a proposal to perform services or provide Products (including prior to the date of this agreement) or (B) with whom/which [Wahlberg Construction] had actual direct contact on behalf of [Benson Builders], or about whom/which [Wahlberg Construction] acquired non-public information in connection with [its] engagement by [Benson Builders] at any time (including prior to the date of this agreement) preceding the Agreement termination.

(*Id.* § 2(e)(i).)

In September 2010, Wahlberg obtained an opportunity to work on a custom home for John Arntzen in Conover, Wisconsin (the "Arntzen Project"). (Wahlberg Decl. I ¶ 42.) Wahlberg obtained the referral from Jeremy Oberlander, Wahlberg's colleague. (*Id.*) On September 7, 2010, Wahlberg and Arntzen signed a construction contract. (*Id.*)

Wahlberg alleges that on September 9, 2010, Pachmayer called Wahlberg (*Id.* ¶ 45),

2

informed him that Arntzen was a "contact" of Benson Builders and, thus, Wahlberg's work on the Arntzen Project violated the NSA. (*Id.* ¶¶ 48, 50.) Furthermore, Pachmayer followed up the phone conversation with an email, which stated that "it appears" the Arntzen Project "*may* well be a violation" of the NSA, and it "is in everybody's interest to address this promptly." (*Id.* (emphasis added).)

On February 15, 2011, Benson Builders sent a letter to Wahlberg regarding a "possible violation" of the NSA. (Docket no. 11-3 at 17.) The letter states that "if Benson learns of any future violations [of the NSA] they intend to aggressively pursue their rights under the Agreement. Benson is prepared to seek remedies for breach of the Agreement, including, without limitation, an injunction prohibiting Wahlberg from violating the terms of the Agreement." (*Id.* at 17-18.)

Over one year later, on February 28, 2012, Benson Builders' counsel sent another letter to Wahlberg's counsel, apparently in response to Wahlberg's request to sign a release from the NSA. (Docket no. 11-3 at 20.) In the letter, Benson Builders declined to sign the release and said that Benson Builders "intends to vigorously enforce the [NSA]." (*Id.*) The letter also implies that Benson Builders did not *know* of any intention by Wahlberg to breach the NSA.[1]

Shortly thereafter, on March 2, 2012, Wahlberg filed the instant declaratory judgment action "request[ing] that the Court declare [the NSA] void and unenforceable." (Compl. ¶ 1, 54, 58-60.) Benson Builders, on the other hand, believes that the NSA is a valid and enforceable contract.

On April 21, 2012, John Wahlberg stated that he had "been approached by former customers who would like to engage Wahlberg Construction for construction and carpentry work." (Wahlberg Decl. I ¶¶ 60, 61.) On May 8, 2012, Pachmayer stated that "[Benson Builders] did not find that any violations had occurred" during Wahlberg's work on the Arntzen Project. (Docket no. 20 at 5.) In

---

[1] The pertinent portion states: "If by your letter you are implying that Mr. Wahlberg intends to breach said non-solicitation agreement, I encourage you to bring the matter to our attention and I will discuss with my client." (Docket no. 11-3 at 20.)

3

addition, Pachmayer stated that he did not have any "current knowledge of any potential violations by [Wahlberg] of the terms of the Agreement, and I have no current intentions of taking any actions for any unknown violations of the Agreement." (Pachmayer Decl. ¶ 16.)

Subsequently, on May 21, 2012, John Wahlberg signed another declaration which identifies nine more potential clients by name in several cities in Michigan, which he believes Benson would claim as "Customers" covered by the NSA[2]. (Wahlberg Decl. II (docket no. 18-1) ¶ 4, 5.) These clients appear to be the unidentified potential clients in Wahlberg's first declaration. Benson Builders stated that it "has not yet had an opportunity to evaluate this list." (Docket no. 20 at 5.) Therefore, Benson Builders did not opine whether any of these potential clients of Wahlberg would be a "Customer" under the NSA or if the potential clients were solicited in violation of the NSA. John Wahlberg stated that the NSA "is currently preventing me from finalizing engagements with the specific customers I've named." (Wahlberg Decl. II ¶ 8.)

In Benson Builders' response to Wahlberg's motion for summary judgment, Benson Builders clarified its interpretation of the Non-solicitation of Customers clause.

> The Agreement does not prevent [Wahlberg] from working in any geographical location or for any customer. The Agreement does not prevent the Plaintiffs from generally advertising, *or from accepting any new customers that approach [Wahlberg], regardless of whether these new customers could be considered customers of [Benson Builders] under the terms of the Agreement*. The Agreement only prohibits Plaintiffs from actively engaging in specified conduct for a limited period of time " . . . so as to cause, or attempt to cause any Customer not to do business with [Benson Builders]."

(Def.'s Resp. to Pls.' Mot. Summ. J. at 12 (emphasis added).)

## II. ANALYSIS

The Court must determine whether subject matter jurisdiction exists before considering the

---

[2] John Wahlberg does not say that *he* thinks the potential clients fall within the NSA's coverage; he says that he believes Benson Builders will claim that the potential clients do.

4

motion to transfer venue or motion for summary judgment. *See Ogle v. Church of God*, 153 F. App'x 371, 374 (6th Cir. 2005) (citing *Moir v. Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990) (noting that a Rule 12(b)(1) motion must be decided before any consideration of a motion on the merits can occur)); *Grand Blanc Ed. Ass'n v. Grand Blanc Bd. of Ed.*, 624 F.2d 47, 49 (6th Cir. 1980) ("We are of the view that since we lack subject matter jurisdiction, we have no power to transfer the case.").

Because the Court's jurisdiction is challenged at the motion-for-summary-judgment stage, Wahlberg has the burden of persuading the court that subject matter jurisdiction exists by setting forth particular facts that could have been considered on a motion for summary judgment. *See Ogle*, 153 F. App'x at 375 ("The plaintiff, as the party invoking federal subject matter jurisdiction, bears the burden of persuading the court that subject matter jurisdiction exists in the case.") *with Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Ogle*, 153 F. App'x at 375 ("Where the defendant brings a factual attack on subject matter jurisdiction, no presumption of truth applies to the allegations contained in the pleadings, and the court may consider documentary evidence in conducting its review." (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 2005))). All of the facts set forth in the Background section of this Opinion are properly before the Court because the facts are supported by declarations and exhibits.

Article III of the United States Constitution restricts a court's jurisdiction to "cases" and "controversies." U.S. Const. art. III § 2. Among the doctrines encompassed in this requirement is the "ripeness" doctrine.

Benson Builders asserts that Wahlberg's complaint is not ripe because Benson Builders does not know of any past, current, or future violation of the NSA and, accordingly, Benson Builders has not attempted to "actively enforce" the NSA. (Def.'s Mot. at 4-5.) In addition, Benson Builders points out that Wahlberg has not asserted that Benson Builders violated the NSA. (*Id.* at 5.) On the

5

other hand, Wahlberg believes that Benson Builders would claim Wahlberg's potential clients "as covered by the terms of the" non-solicitation clause, which is preventing him from finalizing engagements with potential clients. (Wahlberg Decl. II ¶¶ 5, 8.)

"If a claim is unripe, federal courts lack subject matter jurisdiction and the complaint must be dismissed." *Bigelow v. Mich. Dep't of Natural Res.*, 970 F.2d 154, 157 (6th Cir. 1992). "Ripeness is a question of timing. The doctrine dictates that courts should decide only existing, substantial controversies, not hypothetical questions or possibilities. Ripeness becomes an issue when a case is anchored in future events that may not occur as anticipated, or at all." *City Commc'ns, Inc. v. City of Detroit*, 888 F.2d 1081, 1089 (6th Cir. 1989) (citations omitted); *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 399 (6th Cir. 2001). To determine whether a claim is ripe, a court must ask two questions: "(1) is the claim fit[] . . . for judicial decision in the sense that it arises in a concrete and factual context and concerns a dispute that is likely to come to pass and (2) what is the hardship to the parties of withholding court consideration?" *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008) (en banc) (internal quotations omitted); *see also Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1767 n.2 (2010). "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007).

In *Genentech*, the plaintiff wanted to stop making royalty payments pursuant to a licensing agreement. *Genentech*, 549 U.S. at 121. The plaintiff faced two choices: A) continue to make royalty payments, even though the plaintiff alleged that it had the right to stop making the payments, or B) stop making royalty payments and face imminent civil litigation. *Id.* at 122. Importantly, the

6

risk of civil suit was certain and imminent; the defendant clearly expressed the intent to sue if the plaintiff stopped making royalty payments. *Id.* The Court found that subject matter jurisdiction existed, reasoning as follows:

> As then-Justice Rehnquist put it in his concurrence, "the declaratory judgment procedure is an alternative to pursuit of the arguably illegal activity." [*Steffel v. Thompson*, 415 U.S. 452, 480 (1974)]. In each of these cases, the plaintiff had eliminated the imminent threat of harm by simply not doing what he claimed the right to do . . . . That did not preclude subject-matter jurisdiction because the threat-eliminating behavior was effectively coerced. The dilemma posed by that coercion–putting the challenger to the choice between abandoning his rights or risking prosecution–is a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate.

*Genentech,* 549 U.S. at 129 (citations and quotations omitted); *Fieger v. Mich. Supreme Court*, 553 F.3d 955, 971 (6th Cir. 2009) ("We agree that the purpose of the Declaratory Judgment Act is to ameliorate the dilemma posed by 'putting the challenger to the choice between abandoning his rights or risking prosecution.'" (quoting *Genentech*, 549 U.S. at 129)).

Here, Wahlberg seeks a declaratory judgment as an alternative to engaging potential clients and potentially being sued for breaching the NSA. (Wahlberg Decl. I ¶ 63.) Moreover, Wahlberg claims that it has eliminated the threat of being sued for breach of contract because Wahlberg has not done what it claims a right to do – engage the identified potential clients. Therefore, according to Wahlberg, this case is ripe for adjudication because the coercion Wahlberg faces – choosing between not engaging potential clients or risk being sued for breach of contract – is a dilemma that Wahlberg claims the Declaratory Judgment Act seeks to ameliorate.

In the instant case, however, Wahlberg has not carried its burden to show that Wahlberg is likely to be sued if it engages the potential clients. *Fieger v. Michigan Supreme Court*, 553 F.3d 955 (6th Cir. 2009), is instructive. Distinguishing *Genentech*, the Sixth Circuit dismissed a case for lack of subject matter jurisdiction because the plaintiff did not demonstrate a threat of sanctions in the

event of undertaking future activity. *See Fieger,* 553 F.3d at 971. In *Fieger*, the Sixth Circuit distinguished *Genentech* by noting the following "crucial observation" made by the Supreme Court:

> There is no dispute that [the case and controversy] standards would have been satisfied if petitioner had taken the final step of refusing to make royalty payments under the 1997 license agreement. Respondents claim a right to royalties under the licensing agreement. Petitioner asserts that no royalties are owing because the Cabilly II patent is invalid and not infringed; and alleges (without contradiction) a threat by respondents to enjoin sales if royalties are not forthcoming. *The factual and legal dimensions of the dispute are well defined and, but for petitioner's continuing to make royalty payments, nothing about the dispute would render it unfit for judicial resolution*.

*Id.* at 971 (citing *Genentech*, 549 U.S. at 128). As opposed to a well-defined legal dispute like the one identified in *Genentech*, the plaintiffs in *Fieger* merely "speculate[d] that injury will result." *Id.* The plaintiffs did not "present[] sufficient facts to demonstrate a threat of sanction arising from their unspecified future criticisms." *Id.* at 964. "[F]uture injury is conjectural, and the 'dispute' is amorphous, rendering it 'unfit for judicial resolution.'" *Id.* at 971.

Similar to *Fieger*, this Court lacks subject matter jurisdiction because it is pure conjecture that an actual dispute will arise over a breach of the NSA. Wahlberg stated that each potential client he seeks to engage approached him. (Wahlberg Decl. I ¶¶ 60, 61; Pls.' Resp. to Def.'s Mot. to Dismiss at 2.) Benson Builders has clarified that, regardless of whether the potential clients are "Customers" under the NSA, Wahlberg can engage new customers who approached Wahlberg. (Def.'s Resp. to Pls.' Mot. Summ. J. at 12.) Therefore, Wahlberg has not come forth with sufficient facts that there is an imminent dispute because Benson Builders may never assert that Wahlberg breached the NSA. *See Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 580-81 (1985) (explaining that a case is not ripe where contingent future events may not occur as anticipated or may not occur at all); *Analect LLC v. Fifth Third Bancorp*, 380 F.App'x 54, 56 (2d Cir. 2010) (dismissing a claim that sought a declaration that a contract between the parties was void or

8

unenforceable because of "the absence of any imminent attempt to enforce that contract") (citing similar cases); *Bigda v. Fischbach Corp.*, 101 F.3d 108 (2d Cir. 1996) (dismissing a case for lack of ripeness because plaintiff's counsel stated that the plaintiff had not sought to act contrary to the contract).

This Court does not have jurisdiction where future events are not sufficiently real or immediate. *Maryland Cas. Co.*, 312 U.S. at 273. As Wahlberg put it: "the contract position [Benson Builders] now asserts is totally inconsistent with what caused this dispute in the first place." (Docket no. 19 at 5.) In other words, Wahlberg would not have filed this lawsuit had Wahlberg previously understood the NSA's breadth (or at least Benson Builders' interpretation). Therefore, this case does not arise out of a concrete and factual context where a dispute is likely or imminent to arise. *See Warshak*, 532 F.3d at 525.

In regards to the two letters that Benson Builders sent to Wahlberg, the fact that Benson Builders has said that it will enforce its purported contractual rights at some point in the future does not make the dispute "sufficiently immediate and real." *See Kelly v. E.I. DuPont de Nemours & Co.*, 17 F.3d 836, 845 (6th Cir. 1994). Since the day Wahlberg signed the NSA, the possibility that Benson Builders would enforce the NSA has been lurking in the background. *See Casden v.* Burns, 306 F. App'x 966, 972 (6th Cir. 2009) ("[T]his Court has held that a claim is ripe when it is 'highly probable' that the alleged harm or injury will occur."); *accord Jones v. Sears Roebuck & Co.*, 301 F.App'x 276, 283 (4th Cir. 2008) ("We thus agree . . . with the courts that have deemed a challenge to an arbitration provision, in the absence of an underlying dispute or imminent injury, to be nonjusticiable."). Simply because Benson Builders inquired into a possible violation (the Arntzen Project), but then found that no violation occurred, the threat of *future* enforcement has not become "sufficiently immediate and real."

Given Benson Builder's interpretation of the contract and the fact that John Wahlberg said

9

that each potential client approached him, Wahlberg faces no hardship by this Court withholding consideration. *See Warshak*, 532 F.3d at 525. Wahlberg's business will be uninterrupted because Wahlberg can engage every potential client that he identified, so long as the potential clients approached him (which he stated each did).

If the case is indeed ripe, unbeknownst to the Court, the hardship Wahlberg faces is small. Wahlberg must simply provide factual support, *see* Fed. R. Civ. P. 56(c), to allow this Court to draw the conclusion that Wahlberg's potential clients are likely to be "Customers" that Wahlberg seeks to solicit (or believed that it did solicit) in a manner that might violate the NSA. For example, Wahlberg could provide a letter from Benson Builders which says that Benson Builders believes that Wahlberg would breach the NSA by engaging one of the identified potential clients. If Wahlberg cannot put forth particular facts, in one form or another, then the lack of ripeness is confirmed because, in that case, Wahlberg has no reason to believe that it is being coerced into not engaging in "arguably illegal activity." *See Genentech*, 549 U.S. at 129.

Even though the parties disagree over whether the NSA is a valid and enforceable contract, this is not a defined legal dispute that creates jurisdiction. The Declaratory Judgment Act did not expand federal courts' jurisdiction. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950). Jurisdiction is determined by considering a hypothetical coercive action between the parties. A coercive action between Wahlberg and Benson Builders would be for an alleged breach of the NSA. At this juncture, neither party has put forth facts to show that a breach of contract claim is likely or imminent. Even if Wahlberg engaged every client that it identified, Benson Builders would not suffer an injury because, by Benson's own admissions, Wahlberg would not have violated the NSA.

Finally, any controversy arising out of the Arntzen Project is moot. The right to declaratory relief is determined from the present moment, not when the action was initiated. *See Golden v.*

*Zwickler*, 394 U.S. 103, 108 (1969); *Merced Rosa v. Herrero*, 423 F.2d 591, 593 (1st Cir. 1970) ("A petition for a declaratory judgment is no exception to the rule that mootness is to be judged at the present moment, not as of the date of the filing of the complaint."). An action can become moot "if the opposing party disclaims the assertion of countervailing rights." Wright, *et al.,* 10B Fed. Prac. & Proc. Civ. § 2757 (citing cases). Benson Builders has stated that Wahlberg did not violate the NSA when Wahlberg undertook the Arntzen Project. (Docket no. 20 at 5.) Hence, Benson Builders does not claim a countervailing right in regards to the Arntzen Project; both parties agree that the Arntzen Project did not run afoul of the NSA. While a controversy can still be ripe if a dispute is likely to re-arise, Wahlberg, as discussed above, has not provided factual support to show that another dispute is likely to arise.

### III. CONCLUSION

Because the instant case is not ripe for adjudication, or at least Wahlberg has not fulfilled its burden to make such a showing, this Court lacks subject matter jurisdiction. The case will be dismissed without prejudice to allow the parties an opportunity to show that a legal disagreement is likely or imminent.


Dated: July 24, 2012                     /s/ Gordon J. Quist
                                         GORDON J. QUIST
                                         UNITED STATES DISTRICT JUDGE

11